# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

LARAINE MOODY,                              )
                                            )
        Plaintiff,                          )        Case No: 15 C 5217
                                            )
v.                                          )        Judge Thomas M. Durkin
                                            )
CRETE-MONEE SCHOOL DISTRICT 201-U,          )
CRETE-MONEE SCHOOL DISTRICT BOARD           )
OF EDUCATION, and ANTHONY EDISON, in        )
his individual capacity,                    )
                                            )
        Defendants.                         )

## MEMORANDUM OPINION AND ORDER

This is a reverse discrimination case brought by Plaintiff Laraine Moody, a resident of Monee, Illinois. Moody alleges discrimination and retaliation claims under 42 U.S.C. §§ 1981, 1983, and 1988, and Title VII, 42 U.S.C. § 2000e-2 *et seq.* against the Crete-Monee School District 201-U ("the District"), the Crete-Monee Board of Education ("the Board"), and Anthony Edison. Edison was an Assistant Superintendent for the District at the time of the events at issue, and is sued in his individual capacity.[1] Defendants have filed a Rule 12(b)(6) motion to dismiss. R. 8. For the reasons that follow, Defendants' motion is denied.

---

[1] The case caption on Defendants' filings [R. 8, R. 15] indicates that Edison is being sued in his official capacity. The Complaint, however, states that Edison is being sued in his individual capacity. R. 1 (Compl., ¶ 9). Defendants should correct this typographical error for future filings.

LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g.,*
*Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th
Cir. 2009). A complaint must provide "a short and plain statement of the claim
showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to
provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp.*
*v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an
unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels
and conclusions, and a formulaic recitation of the elements of a cause of action will
not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial
plausibility when the plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the misconduct alleged.'"
*Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In
applying this standard, the Court accepts all well-pleaded facts as true and draws
all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

BACKGROUND

The well-pleaded facts of the Complaint, accepted as true for purposes of this
motion, show the following. At all relevant times, the Superintendent of the District
was John Rodgers. Rodgers was assisted in his duties by three Assistant

Superintendents. Edison was the Assistant Superintendent for Human Resources ("HR"); George Elrod was the Assistant Superintendent for Student Affairs, and Robert Groos was the Assistant Superintendent for Business. Rodgers, Edison, and Elrod are African American, while Groos is Caucasian. Moody alleges that there was a great deal of racial tension within the District and on the Board, and that Edison played a large role in this tension. Specifically, after Edison became head of HR, all but one part-time Caucasian employee left. Further, Edison would only hire African Americans as replacements. Edison had considerable influence over the Board, and was rumored to be Rodgers' successor as Superintendent when Rodgers' contract expired.

Moody is Caucasian and was employed by the District from 2006 to July 1, 2013 in the position of Bookkeeper-Fees/Attendance. Her job included working with Skyward, an extensive Student Database Software Program used for State Reporting and to file the annual General State Aid figures. The District uses a salary matrix system to assign salary ranges for jobs within the District. Employees who work in the District's Central Office fall within one of the following categories: Support Staff, Supervisor/Manager, Coordinator, Director, Assistant Superintendent, and Superintendent. Moody's position of Bookkeeper-Fees/Attendance was within the Support Staff category. As of June 30, 2013, Moody's annual full-time salary was $44,894.

In or about January 2008, the Board hired Ingrid Stevens, an African American, for the position of HR Director, reporting to Edison. Stevens'

performance as HR Director did not meet her employer's expectations, but Edison did not want to terminate her. Instead, Edison eliminated Stevens' HR Director position and created a new position for Stevens called "Student Affairs Analyst." As Student Affairs Analyst, Stevens reported to Elrod and was responsible for student registration ("District Registrar"), Transportation, and some limited HR responsibilities. When the District creates a new position, it assigns the position a salary range by comparing the job functions of the new position with the job functions of existing positions to determine with which category the new job is most closely aligned. Stevens' new position as Student Affairs Analyst was categorized as a Support Staff position and thus constituted a demotion for Stevens. Nevertheless, her salary was reduced by less than 10 percent, and was greatly in excess of the "Support Staff" matrix. Stevens performed poorly in her new role. Between October and December of 2012, Stevens received two letters of reprimand, two suspensions, and a 30-day probation period relating to her job performance as Student Affairs Analyst. Stevens' poor job performance prompted the District to remove her Transportation responsibilities. Stevens' salary, however, remained unchanged.

Stevens' job duties as District Registrar overlapped with Moody's job responsibilities. For example, Stevens was responsible for entering the data into Skyward and Moody was responsible for monitoring the data. Stevens' District Registrar responsibilities were her most important and most time-consuming job functions. As District Registrar, Stevens was required to timely and accurately enter data into Skyward for purposes of State Reporting. Stevens failed to

adequately perform these critical responsibilities. The summer 2012 registration process went so poorly that Stevens was sent home, leaving Moody and Elrod to answer staff questions, create missing forms, and deal with angry parents who sometimes had to wait six hours or more to register their children. Stevens also repeatedly made errors when reporting data in Skyward, which impacted the District's eligibility for funding. Rodgers, Elrod, and Groos determined that Stevens should be terminated. Because Moody had knowledge of Skyward and had worked with Stevens on the reporting process, Rodgers, Elrod, and Groos asked her to catalog Stevens' reporting errors and explain the implications of those mistakes on school funding. Moody complied and provided the requested information.

When Stevens learned that Rodgers, Elrod, and Groos were seeking to terminate her, she filed a charge of discrimination with the Board. Edison and an attorney for the District subsequently interviewed Moody regarding Stevens' reporting errors during the 2012 registration process. At the meeting, Moody specifically was asked if she felt the errors made by Stevens were excessive and exceeded those of other people in the District. Moody gave her honest opinion and replied yes. Edison, through his body language and facial expressions, communicated his anger about Moody's statements. Stevens subsequently was removed from the District Registrar position and transferred back to HR under Edison's supervision.

Rodgers, Elrod, and Groos later approached Moody about whether she would consider taking on the job duties of District Registrar, in addition to her existing

duties as Bookkeeper. Moody voiced concern that the joint position would require her to perform substantial overtime to manage the increased workload. After analyzing the time requirements for both positions, Moody and Groos concluded that the joint position could not be performed in a 40-hour work week and that the position would require approximately 300-plus hours of overtime each year. Further, during certain time-sensitive months, Moody and Groos determined that one person could not perform both the District Registrar and the Bookkeeper job functions. To reconcile the positions, Moody and Groos discussed making the District Registrar role supervisory during the busy months. When the topic of pay arose, Moody told Groos that she thought she should be paid what Stevens was paid. Groos conferred with the Board and advised Moody that her pay would be lower than Stevens' pay because Stevens was being paid to perform two jobs: District Registrar and Transportation. In response, Moody asserted that she also was being asked to perform two jobs: District Registrar and Bookkeeper, and argued that she should be paid at least the same amount as Stevens, a person who failed to adequately perform the same job functions. Moody also shared her salary concerns with Rodgers.

On June 4, 2013, Moody asked Groos to clarify in writing that the District Registrar position would be supervisory during the spring/summer registration process. With respect to her prospective salary, Groos informed Moody that the Board insisted the job be classified in the Coordinator category, with a maximum salary of $51,183, approximately $30,000 less than Stevens had been paid to

perform the same functions. Moody told Groos that she would not accept the position at that rate. Groos then advised Moody that he could extend the matrix salary range to pay her $62,392. Believing that the Board would not approve a higher rate, Moody agreed to accept the position with a $62,392 salary plus overtime, so long as it was clear that she would not be required to perform all District Registrar duties herself and that it would be a supervisory role from June to September as previously discussed.

Edison, who is responsible for all personnel decisions, was aware of the agreement between Groos and Moody and agreed to present the proposal to the Board for approval. Edison, however, presented a different proposal to the Board. The proposal Edison presented included a lower salary and did not specify the supervisory nature of the position during the summer registration process. On June 17, 2015, Groos advised Moody that the Board approved the position at a salary of $51,183, the rate Moody previously rejected. Moody considered the offer a "slap in the face" and advised Groos that she felt Edison was being vindictive because Moody is Caucasian and had participated in the Stevens investigation. Moody also shared her complaint with Rodgers, who agreed to bring her concerns to the Board.

On June 20, 2013, following a discussion with the Board, Groos advised Moody that he had been "directed to" inform her that, effective July 1, 2013, her job title would be changed to District Registrar/Student Database Analyst and that her salary would be $47,285. Further, the job description for the joint position was not revised to allow for a supervisory role during the summer registration process.

Groos told Moody that he, Rodgers, and Elrod had argued for her, but that the Board disregarded the time analysis and only would listen to Edison.

Moody felt that she was being set up to fail so that she could be fired at a later date. Nevertheless, Moody believed that she had no other option but to accept all of the new responsibilities. She feared further retaliation if she continued to press her concerns. Moody experienced extreme anxiety over what was going to be expected of her, doing two jobs at once, which, according to the time analysis, was impossible for Moody to do by herself. She experienced further anxiety over what she considered to be blatant discrimination and retaliation. Moody suffers from a medical condition that is exacerbated by stress and anxiety. After Moody learned that the Board decided to change her position, she experienced anxiety that triggered manifestations of her medical condition, which resulted in vertigo, periods of dizziness, and migraines. The conditions became so debilitating that Moody initiated a medical leave of absence as of July 1, 2013.

ANALYSIS

A.    MOODY'S DISCRIMINATION CLAIM

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). Courts have interpreted the statutory term "compensation, terms, conditions, or privileges of employment" as requiring a plaintiff to prove the existence of an "adverse employment action." *See Washington v. Ill. Dep't of Rev.*, 420 F.3d 658, 660 (7th Cir.

2005) (the requirement of an "adverse employment action" is "a judicial gloss on the word 'discrimination'" in Title VII). The Seventh Circuit has provided the following definition of an adverse employment action:

> We have defined an adverse employment action as more disruptive than a mere inconvenience or an alteration of job responsibilities. A material adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. Of course, not everything that makes an employee unhappy will suffice to meet the adverse action requirement. Rather, an employee must show that material harm has resulted from . . . the challenged actions.

*Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002) (internal quotation marks and citations omitted).

Defendants point to the allegations in the Complaint regarding Moody's new job assignment as District Registrar/Student Database Analyst, and argue that Moody has failed to allege an adverse employment action. Defendants rely on a line of cases that hold a job transfer, which does not result in a material change in compensation or other benefits, a significant reduction in career prospects, or humiliating, degrading or unsafe work conditions, as a matter of law is not an adverse employment action. *See, e.g., Herrnreiter v. Chi. Hous. Auth.,* 315 F.3d 742, 744-46 (7th Cir. 2002); *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 273–74 (7th Cir. 1996); *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 135-36 (7th Cir. 1993); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885-86 (7th Cir. 1989). Normally, "[t]he question whether a change in an employee's job or

working conditions is materially adverse, rather than essentially neutral, is one of fact," *Williams*, 85 F.3d at 273, and so should not be resolved on a motion to dismiss. *See Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006) ("Whether any given step is an adverse employment action (alone or in combination with some other act) goes to the merits; these details may be explored in discovery, [and] on motion for summary judgment[.]"). Defendants argue, however, that Moody has "effectively pleaded herself out of court," *Tomayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008), by voluntarily providing facts in her complaint demonstrating she is not entitled to relief. *See* R. 8 at 3; R. 15 at 2. In particular, Defendants argue that, by admitting in her Complaint that her transfer resulted in an increase in her pay from $44,894 per year to $47,285 per year, Moody cannot establish the existence of an adverse employment action. The Court rejects Defendants' argument and holds that Moody's admission in her Complaint that her pay increased when she was transferred to her new job is not by itself dispositive of her discrimination claim for at least two reasons.

First, Moody has alleged an adverse employment action in the form of disparate pay. *See Daniels v. Fed. Reserve Bank of Chi.*, 2004 WL 419796, at *14 (N.D. Ill. Mar. 4, 2004) ("an allegation of disparate pay is, in general, sufficient to state an adverse employment action"). Insofar as Moody's disparate pay claim is concerned, the relevant comparison is not between the pay Moody received in her old job and the pay she was given for her new job, but rather the pay Moody received for her new job and the pay other similarly situated persons received. *See*

*Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1030-31 (7th Cir. 2003) (plaintiff established that "she suffered an adverse employment action, namely a paycheck reflecting her 1997 salary which was determined with a lower raise than that given her coworkers"); *Smith v. Eli Lilly & Co.*, 2012 WL 2016205, at *4 (S.D. Ind. June 5, 2012) (allegation that plaintiff "'was paid less and received less merit than those who did comparable work'" adequately stated discrimination claim for disparate pay).

As the Court reads Defendants' argument, they contend that the Complaint raises only a job transfer claim, *not* a disparate pay claim, apparently because the disparate pay claim arose as a result of a job transfer.[2] But Defendants have offered no logic or reason why Moody should be foreclosed from raising a disparate pay claim simply because the claim arose out of events relating to her involuntary transfer to a new position. The Complaint alleges specific facts concerning the job to which Moody was transferred compared to the job previously performed by Stevens, the alleged comparator, which, if taken as true, show that Moody was paid

---

[2] Specifically, Defendants argue as follows:

> As the plain facts of [Moody's] complaint allege, the "adverse action" that she suffered was that she was transferred to a new position with additional duties that "overlapped" with her current duties at a rate of pay which, although higher than she previously earned, was not as high as she wished. These are allegations about an involuntary transfer as opposed to a disparate pay claim. Absent the failure to pay additional monies subsequent to the assignment of additional duties, there was no "disparate" act according to her own complaint.

R. 15 at 3.

11

significantly less than Stevens for a comparable job. Defendants assert, in a conclusory fashion,[3] that Stevens is not an adequate comparator because her job duties included Transportation while Moody's job duties in her new position did not. *See* R. 15 at 3. But Moody has alleged that she also had additional duties in her new position besides the duties associated with the District Registrar. *See* R. 1 (Compl. ¶¶ 60, 69). "[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (internal quotation marks and citation omitted). Although similarly situated employees "must be directly comparable to the plaintiff in all material respects," they "need not be identical in every conceivable way." *Id*. at 846 (internal quotation marks and citations omitted); *see also id*. at 851-52 (noting "with some concern the tendency of judges in employment discrimination cases to require closer and closer comparability between the plaintiff and the members of the comparison group") (internal quotation marks and citation omitted). In particular, courts have held that "jobs may be equal even though one [employee] is given extra duties if the other [employee] also performs extra duties of equal skill, effort, and responsibility, or if the extra duties take little time and are only of peripheral importance." *Wojciechowski v. Nat'l Oilwell Varco*, L.P. 763 F. Supp. 2d 832, 846 (S.D. Tex. 2011) (Equal Pay Act case). The crucial inquiry is "whether the jobs to be compared have a 'common core' of tasks, *i.*e., whether a significant portion of the two jobs is identical.

[3] Defendants' failure to develop this argument constitutes a waiver. *See Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006).

If a plaintiff establishes this 'common core,' the question then becomes whether any additional tasks make the jobs 'substantially different.'" *Fallon v. State of Ill.*, 882 F.2d 1206, 1209 (7th Cir. 1989) (Equal Pay Act case) (internal quotation marks and citations omitted).

Moody has alleged sufficient facts to support her claim that her new job was the same in material respects as the job performed by Stevens. She also has alleged that Stevens received significantly higher pay than she did. Stevens is African American and Moody is Caucasian. These facts are sufficient to plead a claim of reverse racial discrimination based on disparate pay. *See Coleman*, 667 F.3d at 846 ("So long as distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied.") (internal quotation marks and citation omitted). In any event, the factual nature of the issue makes it improper for resolution on a motion to dismiss. *See id.* at 847 ("Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue.") (internal quotation marks and citation omitted).

Second, independent of a disparate pay claim, Moody also has adequately alleged an involuntary transfer as an adverse employment action. Defendants are correct that the Seventh Circuit has stated that "a *purely* lateral transfer . . . cannot rise to the level of a materially adverse employment action." *Williams*, 85 F.3d at 274 (emphasis in original)*; see also Herrnreiter,* 315 F.3d at 745 (a "purely

subjective preference for one position over another" is insufficient). But both *Williams* and *Herrnreiter* were decided on a motion for summary judgment, and the facts in both cases after discovery showed "no reduction in pay and no more than a minor change in working conditions." *Williams*, 85 F.3d at 274; *see also Herrnrieter*, 315 F.3d at 754 ("The two jobs were equivalent other than in idiosyncratic terms that do not justify trundling out the heavy artillery of federal antidiscrimination law[.]").

It would be inappropriate to extrapolate from those cases, as Defendants do, a blanket rule that a plaintiff must allege a reduction in pay to survive a challenge made on a motion to dismiss. Indeed, the Seventh Circuit has "emphasize[d] . . . that an employer does not insulate itself from liability for discrimination simply by offering a transfer at the same salary and benefits." *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456-57 (7th Cir. 1994). "Title VII does not limit adverse job action to strictly monetary considerations. One does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." *Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987) (citing *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir. 1980) (holding that a teacher's transfer with no adverse economic impact nevertheless constituted an adverse employment action where the evidence showed the transfer resulted in a "radical change in the nature of the work [the plaintiff] was called upon to perform," thereby "interfer[ing] with a condition or privilege of employment adversely affecting her status within the meaning of the statute")); *see*

*also Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 24 (1st Cir. 2002) ("Consistent with [the] broad statutory mandate, courts have rejected any bright line rule that a transfer cannot qualify as an 'adverse employment action' unless it results in a diminution in salary or a loss of benefits.").

Defendants also rely on *Herrnreiter,* which summarized the three most common categories of adverse employment actions, to contend that the only way Moody's lateral transfer without a decrease in pay would satisfy the adverse employment action requirement would be if she alleged either a decrease in job responsibilities negatively affecting her career prospects or severe working conditions such as having her office moved to a closet. But the Court is aware of no case that has held that the three categories described in *Herrnreiter* are exclusive. Indeed, the Seventh Circuit has stated that the types of adverse employment actions prohibited by Title VII include a catch-all category of employment actions which have "other indices [of adversity] that might be unique to a particular situation." *Traylor*, 295 F.3d at 788; *see also Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 532-33 (S.D.N.Y. 2002) ("where [a] transfer carries with it serious negative consequences to the plaintiff's conditions of employment, or has *some other attendant negative result*, a transfer may qualify as an adverse employment action") (internal quotation marks and citations omitted) (emphasis added), *aff'd*, 76 Fed App'x 366 (2d Cir. 2003).

Courts have recognized that, in some instances, a change in employment responsibilities "may be so significant and material that it rises to the level of an

adverse employment action." *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 504 (5th Cir. 2014); *see Washington,* 420 F.3d at 662 ("By and large a reassignment that does not affect pay or promotion opportunities . . . is not actionable. But 'by and large' differs from 'never.'"). In *Washington*, the Seventh Circuit reversed the district court's grant of summary judgment in favor of the defendant and remanded for trial where the evidence suggested that, while the plaintiff's reassignment "would not be materially adverse to a normal employee," an objectively reasonable person might see it as being adverse to the plaintiff in light of her peculiar vulnerabilities. *Washington,* 420 F.3d at 662. The court held that, "[a]t this stage of the litigation a court must indulge all reasonable inferences in [the plaintiff's] favor," and that "a jury could find that the [defendant] set out to exploit a known vulnerability and did so in a way that caused a significant (and hence an actionable) loss." *Id.* Defendants cite to *O'Neal v. City of Chicago*, 392 F.3d 909 (7th Cir. 2004), but in that case the court affirmed the grant of summary judgment in favor of the defendant where the changes to the plaintiff's job responsibilities and work conditions after the plaintiff was reassigned were "well within the reasonable scope of her duties as a sergeant in the Chicago Police Department." *Id.* at 913. The court stated that, "[b]y definition, any lateral job transfer will result in changes to an employee's job responsibilities and work condition," and that "[t]o sustain a federal employment discrimination suit, a plaintiff must show *something more than the ordinary difficulties associated with a job transfer*." *Id.* (emphasis added).

If *O'Neal* states the standard for an employment discrimination complaint based on a change in job responsibilities after a job transfer, then Moody has satisfied that standard here. Moody has alleged "something more than the ordinary difficulties associated with a job transfer"; she has alleged that the newly created position to which she was transferred would require her to work excessive and perhaps objectively unreasonable hours. This allegation is supported by specific facts, including allegations that Groos and Moody had performed a detailed analysis of the time commitments required by the newly created position, and had concluded that the position was going to require approximately 300-plus hours of overtime a year, and, even then, simply could not be performed by one person during certain time-intensive months. Citing *Williams,* Defendants argue that any additional inconvenience caused by the new job, including additional work hours, constitutes an insufficient basis for finding the transfer to be adverse. *Williams* held that a salesman's transfer to a different product line was not adverse, despite the fact that the transfer required him to learn new products. *Williams,* 85 F.3d at 274. But the plaintiff in that case "acknowledge[d] that there is so much innovation in the pharmaceutical industry that had he remained in [his old] position he undoubtedly would have had to learn new products as well." *Id*. In other words, the plaintiff in *Williams* admitted that the change in job responsibilities occasioned by his transfer was no more than "the ordinary difficulties associated with a job transfer."

The finding in *Williams* on summary judgment that the "new learning" required by the transfer in that case was objectively immaterial is not comparable

to the finding this Court would be required to make here on a motion to dismiss regarding the increased work load imposed on Moody by the duties required by her new job. On a motion to dismiss, the issue is whether Moody has plausibly alleged facts from which a jury might conclude that Moody's transfer was objectively adverse due to these characteristics of the job. The Court cannot at this juncture exclude the possibility that a reasonable jury might so conclude, notwithstanding that Moody might receive pay for the overtime hours,[4] a raise to perform the new responsibilities, and greater job responsibilities that potentially could enhance her career. While these facts weigh against the transfer being adverse, the alleged facts that the job could not be performed by one person and would perhaps require more overtime than would be objectively reasonable for an employer to require from an employee weigh in favor of the transfer being adverse. In short, it is at least plausible based on the facts as alleged that a reasonable jury might find Moody to have suffered an adverse employment action. *See Santelli v. Electro-Motive*, 136 F. Supp. 2d 922, 935 (N.D. Ill. 2001) (holding on summary judgment that the plaintiff's lateral transfer, which did not include either a demotion or any decrease in pay or benefits, nevertheless could constitute an adverse employment action because her new welding job was "the most difficult welding work at the plant"); *see also Gilmore v. Office of Alcohol & Tobacco Control of the La. Dep't of Rev.*, 2015 WL 5684123, at *4 (M.D. La. Sept. 28, 2015) ("Gilmore has plausibly stated a claim that

---

[4] Defendants claim in their brief that the overtime was paid, but the Court may not consider this additional fact, which is outside the Complaint, on this motion to dismiss.

being required to perform his subordinate's duties in addition to his own may constitute an adverse employment action.").

### B.   MOODY'S RETALIATION CLAIM

"Section 1981 broadly prohibit[s] discrimination in all contractual facets of the employment relationship, including 'post-formation' adverse acts, such as retaliation." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 394 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Retaliation also is prohibited by Title VII. *See* 42 U.S.C. § 2000e-3(a). Defendants argue that Moody's retaliation claim fails because she has not alleged facts showing that she engaged in a statutorily protected activity. Title VII's anti-retaliation provision sets forth two categories of activities protected by that statute. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009). The first category includes "opposition" activities. *See* 42 U.S.C. § 2000e-3(a) (forbidding an employer to discriminate against any individual "because [she] has opposed any practice made an unlawful employment practice by [Title VII]"). The second category includes "participation" activities. *See* 42 U.S.C. § 2000e-3(a) (forbidding an employer to discriminate against any individual "because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]").

Defendants focus on Moody's allegations regarding her participation in Defendants' investigation of Stevens' discrimination claim. Defendants argue that this participation was not sufficient to meet the requirements of the "participation" prong of statutorily protected activity. *See* R.8 at 6-9. The Court need not address

this argument, however, because Moody has stated that her allegations regarding her participation in the Stevens investigation are intended to show discriminatory motive and intent for her discrimination claims, not to provide a basis for her retaliation claims. *See* R. 14 at 12 n.4.

Moody argues that her retaliation claims are based on the "opposition" clause, not the "participation" clause. The facts she alleges in support of her opposition clause retaliation claims include the following: (1) Moody and Groos reached a tentative agreement that Moody would accept a voluntary transfer to the newly created position at a pay of $62,393; (2) the Board refused to approve the position at $62,393 and offered Moody $51,183 instead; (3) on or about June 17, 2013, Moody complained to Rodgers and Groos that the $51,183 offer was the result of racial discrimination; (4) Rogers and Groos communicated Moody's complaints to the Board; (5) on June 20, 2013, three days after Moody complained to Rodgers and Groos, the Board transferred Moody to the newly created job position with a salary of $47,285 and without the previously agreed supervisory role during the summer months. *See* R. 1 (Compl., ¶¶ 62, 66-70, 73, 79, 82, 83, 87). These allegations are sufficient to state a claim for retaliation based on opposition to an unlawful employment practice. *See Crawford*, 555 U.S. at 279 ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity.") (emphasis in original, internal quotation marks and citation omitted); *Davis v. Time Warner Cable of S.E. Wis., L.P.*, 651

F.3d 664, 674 (7th Cir. 2011) (informal complaints can constitute protected activity for purposes of Title VII retaliation claim); *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) (reversing summary judgment on a retaliation claim where the plaintiff engaged in protected activity by complaining of conduct that she reasonably and sincerely believed was unlawful); *Lewis v. Cnty. of Cook*, 2011 WL 839753, at *15 (N.D. Ill. Feb. 24, 2011) ("Defendants focus on the participation clause of Title VII—but it is the opposition clause that applies[ ] . . . [to] [a]n employee's statements challenging sexual discrimination on the part of her employer[.]").

Defendants also argue that Moody cannot establish causation between her discrimination complaint lodged on June 17, 2013 and the Board's decision to reassign her on June 20, 2013 because, "[b]ased upon Plaintiff's complaint, it is clear that the decision that her pay would be based upon a matrix and that she would assume the Registrar positon had already been made prior to June 17 when she first made her complaint of discrimination." R. 8 at 9. Defendants' argument simply ignores the allegations in the Complaint, which show that Moody negotiated with Groos over what her salary should be for the new position, and that she only agreed to the new position at the negotiated rate. Two days after she complained, the Board transferred her to the new position at a rate below the one to which she had agreed. These facts are sufficient to show causation between Moody's alleged complaints about discrimination and the alleged retaliatory act of the Board three days later. *See Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)

("Occasionally . . . an adverse action comes so close on the heels of a protected act that an inference of causation is sensible."); *Magyar*, 544 F.3d at 772 ("Although the lap incidents took place in early August (and perhaps a bit earlier), we think that the approach most favorable to Houston is to assume that the suspicious-timing clock was restarted on September 17 . . ."); *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) (adverse employment actions began "the same month" plaintiff filed the racial discrimination grievance with his union). These facts also are sufficient to show an adverse employment action for purposes of Moody's retaliation claim.[5] *See Tamayo*, 526 F.3d at 1085-86 ("allegation that defendant intentionally engaged in a course of conduct to prevent the plaintiff from being paid the $160,000 per year that she was told she would receive are sufficient"). Accordingly, Defendants' motion to dismiss Moody's retaliation claims also is denied.

## C.  RESPONDEAT SUPERIOR LIABILITY UNDER § 1981

Counts III through VI of the Complaint allege discrimination and retaliation claims against Defendants under to 42 U.S.C. § 1981. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject

---

[5] Just as the requirement of an adverse employment action applies to a plaintiff's claim of discrimination, it applies to plaintiff's claim of retaliation as well. *See Washington*, 420 F.3d at 662.

to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Counts III and IV allege § 1981 claims against the District and the Board, while Counts V and VI allege § 1981 claims against Edison.

In *Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989), the Supreme Court held that § 1981 does not apply directly to state actors. Instead, recovery against a state actor under § 1981 is available only pursuant to the general procedural mechanism created by § 1983. Defendants have moved to dismiss Moody's § 1981 claims against the Board and against Edison on the ground that § 1981 does not apply to state actors under *Jett*. R. 8 at 9-10.

The Court denies Defendants' motion with regard to Moody's § 1981 claims against Edison. Edison is sued in his individual capacity and therefore *Jett* does not apply. In any event, Moody's § 1981 claims against all Defendants are adequately pled through § 1983. The Complaint states explicitly that Moody seeks redress for Defendants' § 1981 rights "as enforced through § 1983 and § 1988." R. 1 (Comp., ¶ 1). That is more than sufficient under federal pleading standards to survive a motion to dismiss. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curiam) (summarily reversing a decision of the Court of Appeals for the Fifth Circuit, which had held inadequate a civil rights complaint against state actors that failed to mention § 1983, specifically stating that the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"); *see also Shah v. Inter–Cont'l Hotel Chi. Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002) ("The plaintiff is not

required to plead . . . statutes, but merely to describe [her] claim briefly and simply."). Accordingly, Defendants' motion to dismiss Moody's § 1981 claims pursuant to *Jett* is denied.

### D.  WHETHER THE DISTRICT IS A PROPER DEFENDANT

Defendants argue that the Court should dismiss Moody's claims against the District because the District is "merely a geographic area of land," which can only act through the Board. R. 8 at 10-11. Defendants also argue that Moody was employed by the Board, and that, therefore, the Board is the only proper entity-defendant in this case. R. 15 at 6-7. The legal basis for Defendants' argument is unclear, but the Court can think of three possibilities. First, Defendants may be arguing that the District lacks the capacity to be sued. *See* Fed. R. Civ. P. 17(b). Second, Defendants may be arguing that the District should be dismissed because the Board, not the District, was Moody's "employer" for purposes of Title VII. Third, Defendants may be arguing that Moody's claims against the District should be dismissed because they are duplicative of her claims against the Board.

In *Stanek v. Saint Charles Community Unit School District*, 783 F.3d 634, 640 (7th Cir. 2015), the Seventh Circuit was asked to decide a similar issue in the context of claims brought under 42 U.S.C. § 1983, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201 *et seq.* Initially, the Seventh Circuit noted that school districts frequently are named in civil lawsuits separately from the school board. *Id.* The Seventh Circuit recognized, however, that "unexamined

assumptions of prior cases do not control the disposition of a contested issue." *Id.* The Seventh Circuit went on to conclude that the issue of whether the school district could be sued independent of the school board did not need to be decided in that case because it was enough that the plaintiff had sued the superintendent in his official capacity. *Id.*

Here, the Court is being asked to decide the issue left open by the Seventh Circuit in *Stanek.*[6] It appears to the Court that this issue may turn, at least in part, on the applicable provisions of the Illinois School Code. For example, § 5/34-2 of the Illinois School Code makes clear that a city constitutes a school district and that the school district shall be known by the name of 'Board of Education of the City of . . .,' and by that name may sue or be sued in all courts and places where judicial proceedings are had." 105 ILCS 5/34-2. This provision applies to cities of over 500,000 inhabitants. *See* Article 34 of the Illinois School Code. A county outside a city of at least 500,000, on the other hand, constitutes an "educational service region," 105 ILCS 5/3A-1, to which other provisions of the School Code potentially apply. Neither side has cited to the relevant provisions of the Illinois School Code, or provided the Court with information regarding the make-up, character, and formation of the Crete-Monee School District, such that the Court can determine which provisions of the Code apply. Further, it is not clear to the Court why Defendants are asking for a ruling on this issue. For instance, Defendants do not explain whether Moody's naming of both the District and the Board has any

---

[6] Unlike the plaintiff in *Stanek*, Moody has not named the superintendent of the school district in his official capacity as a defendant.

substantive implications. If Defendants' argument is merely a technical one based on what they contend is a misnomer, then they should make that clear. Rather than address this issue in a vacuum and without the benefit of adequately developed legal arguments, the Court will deny Defendants' motion to dismiss the District as a defendant. The Court's denial is without prejudice to raising the issue at a later point in the proceedings, such as summary judgment, should Defendants have an adequate legal basis for doing so. Moody also should consider whether it is practically necessary to name both entities.

### E.  PUNITIVE DAMAGES

Finally, Defendants ask the Court to dismiss Moody's claim for punitive damages against the Board. Moody states that she does not intend to seek punitive damages against the Board, so that claim is stricken. R. 14 at 13. Therefore, the Court denies Defendants' motion to dismiss Moody's punitive damages claim against the Board as moot.

### CONCLUSION

For the reasons set forth in this Memorandum Opinion and Order, Defendants' motion to dismiss [R. 8] is denied.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: December 16, 2015